UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PARVIZ IZADJOO, individually and on behalf of all others similarly situated, | § § § | |
| | § | Civil Action No. 4:15-cv-2213 |
| Plaintiff, | § § | JURY TRIAL DEMAND |
| v. | § § | |
| OWEN KRATZ and HELIX ENERGY SOLUTIONS GROUP, INC., | § § § | |
| Defendants. | § § | |

## CLASS ACTION COMPLAINT

Plaintiff Parviz Izadjoo ("Plaintiff"), by his attorneys, except for his own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Helix Energy Solutions Group, Inc. ("Helix" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company.   Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## NATURE OF THE ACTION

1.    This is a securities class action on behalf of all persons who purchased Helix common stock between October 21, 2014, and July 21, 2015, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's claims are asserted against certain of Helix's executive officers and directors.

2.      Helix is an international offshore energy services company that provides specialty services to the offshore energy industry, with a focus on well intervention and robotics operations.  The Company seeks to provide services and methodologies that Helix believes are critical to developing offshore reservoirs and maximizing production economics.  Helix primarily conducts operations in the Gulf of Mexico, North Sea, Asia-Pacific, and West Africa regions.  The Company's services are segregated into four disciplines: well intervention, robotics, production facilities, and subsea construction.

3.      Since October 21, 2014, the Company has misrepresented the time that two of its main well intervention vessels would be idle during 2015.  Specifically, the Company provided guidance relating to the length of time that each vessel would be in regulatory drydock.  During the second quarter of 2015, however, one vessel, the *Q4000* was in drydock for a full month longer than the Company previously disclosed.  The other vessel, the *Helix 534*, was unused for nearly half the quarter, and has not yet been put in regulatory drydock.  As a result, the Company's revenues and earnings have suffered.

4.      On July 21, 2015, Helix issued a press release announcing its financial results for the second quarter of 2015.  The company reported revenue of $166 million, compared to $305 million in the second quarter of 2014, and a net loss of $(2.6) million, compared to net income of $57.8 million in the second quarter of 2014.

5.      On this news, the price of Helix common stock declined from a closing share price of $11.30 on July 20, 2015, to close at $9.40 per share on July 21, 2015, a loss of more than 16.8%, on extremely heavy trading volume.

## JURISDICTION AND VENUE

6.      The  federal  law  claims  asserted  herein  arise  under  §§  10(b)  and  20(a)  of  the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.      This  Court  has  jurisdiction  over  each  Defendant  named  herein  because  each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

9.      Venue  is  proper  in  this  Court  pursuant  to  28  U.S.C.  §  1391(b)  and  §  27  of  the Exchange Act because many of the false and misleading statements were made in or issued from this District.  Helix is headquartered in this District, with its principal place of business located at 3505 West Sam Houston Parkway North, Suite 400, Houston, Texas, 77043.

## PARTIES

10.     Plaintiff purchased Helix's securities as set forth herein and in its certification filed herewith.

11.     Helix is a corporation organized and existing under the laws of the State of Minnesota.  It maintains its principal corporate offices at 3505 West Sam Houston Parkway North, Suite 400, Houston, Texas, 77043.  Its common stock trades on the New York Stock Exchange ("NYSE") under the symbol, "HLX."

12.     Defendant Owen Kratz ("Kratz") is President and Chief Executive Officer and a director of Helix.

13.     Helix and Kratz are collectively referred to herein as "Defendants."

## CONTROL PERSON ALLEGATIONS

14.     By reason of the Kratz's position with the Company as President, Chief Executive Officer, and a director, Kratz possessed the power and authority to control the contents of Helix's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Kratz was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his positions with the Company, and his access to material, non-public information available to him but not to the public, Kratz knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  Kratz is liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

15.     Helix is an international offshore energy services company that provides specialty services to the offshore energy industry, with a focus on well intervention and robotics operations.  The Company seeks to provide services and methodologies that Helix believes are critical to developing offshore reservoirs and maximizing production economics.   Helix primarily conducts operations in the Gulf of Mexico, North Sea, Asia-Pacific, and West Africa regions.   The Company's services are segregated into four disciplines: well intervention, robotics, production facilities, and subsea construction.

16.     Well intervention is any operation carried out on an oil or gas well during or at the end of its productive life, which alters the state of the well or well geometry, provides well diagnostics, or manages the production of the well.

17.     As major and independent oil and gas companies expand operations in the deepwater basins of the world, development of these reserves will often require the installation of subsea trees.  Historically, drilling rigs were typically necessary for subsea well intervention to troubleshoot or enhance production, shift sleeves, log wells or perform recompletions.  The Company's vessels serve as work platforms for well intervention services at costs that are typically significantly less than offshore drilling rigs.  Competitive advantages of Helix's vessels are derived from their lower operating costs, together with an ability to mobilize quickly and to maximize operational time by performing a broad range of tasks related to intervention, construction, inspection, repair and maintenance.  These services provide a cost advantage in the development and management of subsea reservoirs.  The Company expects long-term demand for well intervention services to increase due to the growing number of subsea tree installations and the efficiency gains from specialized intervention assets and equipment.

18.     The Company's well intervention fleet has increased with the addition of the *Helix 534*, which was placed in service in February 2014.  The Company owns four well intervention vessels, the *Q4000*, the *Helix 534*, the *Seawell*, and the *Well Enhancer*, and also includes in its fleet the *Skandi Constructor*, which is a chartered vessel.  Helix plans to further expand its well intervention fleet by adding several more vessels in the near future.

19.     A key measure of Helix's well intervention fleet's productivity is its vessel utilization rate.  In the Company's 10-Q and 10-K filings, Helix commonly discloses its average

vessel utilization rate, which is calculated by dividing the total number of days the vessels generated revenues by the total number of calendar days in the applicable period.

**The Material Misrepresentations and Omissions**

20.    On October 21, 2014, the beginning of the Class Period, the Company filed a Form 8-K with the SEC disclosing the issuance of a press release announcing Helix's third quarter 2014 financial results.  Attached to the 8-K were slides to be used in conjunction with the earnings call with stock analysts that took place on the same day.   The slide that discussed information relating to the Company's expectations for the coming period, slide 20, stated, in pertinent part:

**Looking Forward**

- Gulf of Mexico well intervention fleet activity is expected to remain strong in 2015 and beyond
  - Both vessels, *Q4000* and *H534*, have regulatory dry docks in 2015, which provides headwinds in 2015
- North Sea based well intervention activity may be softer during the winter months
- *Seawell* refurbishment project is expected to near 90+ days in early 2015
- *Q500* expected to enter fleet in Q3 of 2015
- Robotics expected to follow record 2014 with another strong year

21.    During the earnings call, Defendant Kratz was questioned specifically about the regulatory drydock:

**Trey Stolz – Iberia Capital Partners:**
Morning guys. Just one quick question on the guidance, or slide 20 looking forward, and trying to balance this and I know you don't want to be too specific on 2015 yet but the language here, regulatory drydocks in 2015 and headwinds and when I look in my model at in the Q5000 which is a pretty significant bump up in operating income, should I be interpreting this otherwise that the cautionary language here on the drydocks or is 2015 still a pretty significant bump up on well intervention given that introduction of the Q5?

**Owen Kratz – President and CEO**
Let me take that Trey. First of all it I think it's again premature to give specific guidance for 2015. We're doing a bottoms-up approach on our budget, so we don't even know the answer to that question today. I guess it was important for us

to point out that we will have a significant amount of drydock days in 2015. You've got the Seawell out there for 90 plus or minus days, **you have the Q4000 out there for plus or minus 45 days and the H534 for about 30 days**.

Then the question is if we say on schedule with the Q5 that will be a nice boost up but we really don't know the answer to that question. We are still trying to sort it out. So I have given a long winded answer that says we can't answer the question.

(Emphasis added.)

22.     Accordingly, Defendant Kratz cautioned that the Company's business could be challenged by the *Q4000*'s planned drydock, which would be approximately 45 days.

23.     The Company has also disclosed that the *Q4000*'s and *H534*'s drydocks would take place in April and August 2015, respectively.

**The Truth Emerges**

24.     On July 20, 2015, the Company issued a press release announcing its financial results for the second quarter of 2015.  The press release stated in pertinent part:

HOUSTON, TX - Helix Energy Solutions Group, Inc. (NYSE: HLX) reported a net loss of $(2.6) million, or $(0.03) per diluted share, for the second quarter of 2015 compared to net income of $57.8 million, or $0.55 per diluted share, for the same period in 2014 and net income of $19.6 million, or $0.19 per diluted share, for the first quarter of 2015. Net income for the six months ended June 30, 2015 was $17.0 million, or $0.16 per diluted share, compared with net income of $111.5 million, or $1.05 per diluted share, for the six months ended June 30, 2014.

Owen Kratz, President and Chief Executive Officer of Helix, stated, "Our second quarter results are indicative of overall weak industry conditions in the oilfield services sector. ***Our well intervention business was negatively impacted this quarter by a longer than planned Q4000 regulatory dry-dock and customer delays on the H534***; this was partially offset by increased utilization in the North Sea, anchored by the Well Enhancer and the return to work of the Skandi Constructor. This quarter we took delivery of the Q5000 and made the final shipyard payment with proceeds from our Q5000 Term Loan. Additional proceeds from the loan increased our cash position. Helix continues to implement the steps necessary to secure our long term position in this market."

(Emphasis added.)

25.    The Company's quarterly report on Form 10-Q, filed with the SEC on July 22, 2015, explained just how long the *Q4000* was out of service due to the regulatory dry dock.  The 10-Q disclosed that "the *Q4000* worked 26 days during the second quarter of 2015 following completion of its regularly scheduled regulatory dry dock in early June 2015."  In other words, the *Q4000* was in dry dock for 75 of the 91 days in the second quarter—a full month longer than the "plus or minus 45 days" that Defendant Kratz had represented during the October 21, 2014 earnings call.

26.    The 10-Q also disclosed that "[t]he *Helix 534* was utilized for [only] 50 days in the second quarter of 2015 as compared to full utilization in the same period in 2014."  The 10-Q disclosed that the reason for the *Helix 534*'s idle was the "lack of available projects."

27.    The 10-Q further elaborated on the state of Company's vessel utilization.  Due in part to the *Q4000*'s two and one-half month long drydock and *H534*'s idle, the Company's vessel utilization rate for its well intervention vessels during the second quarter was only 63%, compared to 98% in the second quarter of 2014.

28.    As a result of Helix's earnings announcement, the share price of the Company's common stock declined from a closing share price of $11.30 on July 20, 2015 to close at $9.40 per share on July 21, 2015, or over 16.8%, on extremely heavy trading volume.

## LOSS CAUSATION

29.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Helix's securities and operated as a fraud or deceit on Class Period purchasers of Helix securities by materially misleading the investing public.  Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the

price of Helix's securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Helix's securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## FRAUD-ON-THE-MARKET DOCTRINE

30.     At all relevant times, the market for Helix's securities was an efficient market for the following reasons, among others:

a)      Helix securities met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b)      Helix filed periodic public reports with the SEC and the NYSE; and

c)      Helix regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

31.     As a result of the foregoing, the market for Helix's securities promptly digested current information regarding Helix from all publicly available sources and reflected such information in the prices of the securities.  Under these circumstances, all purchasers of Helix securities during the Class Period suffered similar injury through their purchase of Helix securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

32.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Helix who knew that the statement was false when made.

### CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Helix securities during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

34.     The members of the Class are so numerous that joinder of all members is impracticable, since Helix has millions of shares of stock outstanding and because the Company's shares were actively traded on the NYSE.  As of July 17, 2015, Helix had more than 105 million shares issued and outstanding.  While the exact number of Class members in unknown to Plaintiff at this time and can only be ascertained through appropriate discovery,

Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

35.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a)     whether the Exchange Act was violated by Defendants;

(b)      whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e)     whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)     whether the price of Helix securities was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of Helix's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

36.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

37.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

38.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of
### the Exchange Act and SEC Rule 10b-5
### (on behalf of the Class)

39.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

40.     This Count is asserted by Plaintiffs on behalf of themselves and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

41.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Helix's common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Helix's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

42.     Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading;

and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Helix's common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

43.     As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.  Defendants' material misrepresentations and omissions as set forth herein violated that duty.

44.     Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the Class.  Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

45.     As a result of Defendants' fraudulent activity, the market price of Helix was artificially inflated during the Class Period.

46.     In ignorance of the true financial condition of Helix, Plaintiffs and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Helix containing the misleading information, purchased or otherwise acquired Helix's common stock at artificially inflated prices during the Class Period.

47.    Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Helix's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company.  Plaintiff and other members of the Class purchased Helix's stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of Helix's common stock through their misconduct as described herein.  Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Helix.

48.    Throughout the Class Period, Defendants were aware of material non-public information concerning Helix's fraudulent conduct (including the false and misleading statements described herein).  Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

49.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Helix common stock during the Class Period.

**COUNT II**
**Against Kratz for Violation of Section 20(a) of the Exchange Act**
**(on behalf of the Class)**

50.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

51.    During the Class Period, Kratz, as Chief Executive Officer and a director of Helix, was privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other

corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of his possession of such information, Kratz knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.  Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

52.    Kratz was involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  Kratz was aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  Throughout the Class Period, Kratz was able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. Kratz was provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

53.    Kratz also was able to, and did, directly or indirectly, control the conduct of Helix's business, the information contained in its filings with the SEC, and its public statements. Moreover, Kratz made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements.  Because of his position and access to material non-public information available to him but not the public, Kratz knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, Kratz is responsible for the accuracy of Helix's

corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

54.     Kratz acted as a controlling person of Helix within the meaning of Section 20(a) of the Exchange Act.  By reason of his position with the Company, Kratz had the power and authority to cause Helix to engage in the wrongful conduct complained of herein.  Kratz controlled Helix and all of its employees.  As alleged above, Helix is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  By reason of his conduct, Kratz is liable pursuant to section 20(a) of the Exchange Act.

55.     As a direct and proximate result of the wrongful conduct of Helix and Kratz, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## PRAYER

WHEREFORE, Plaintiff demands judgment as follows:

(A)     Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and his counsel as Class counsel;

(B)     Awarding Plaintiff and the members of the Class damages, including interest;

(C)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(D)     Awarding such equitable/injunctive or other relief as the Court may deem just and proper

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  July 31, 2015.

                                        Respectfully submitted,


                                        */s/ Thomas E. Bilek*
                                        Thomas E. Bilek
                                        State Bar No. 02313525 / SDTX Bar No. 9338
                                        **THE BILEK LAW FIRM, L.L.P.**
                                        700 Louisiana, Suite 3950
                                        Houston, Texas  77002
                                        (713) 227-7720


                                        *Counsel for Plaintiff*

**OF COUNSEL:**

Nicholas I. Porritt
Julia J. Sun
Adam M. Apton
**LEVI & KORSINSKY, LLP**
30 Broad Street, 24th Floor
New York, New York  10004
Telephone:  (212) 363-7500
Facsimile:  (212) 363-7171