**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| PARVIZ IZADJOO, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OWEN KRATZ, and HELIX ENERGY SOLUTIONS GROUP, INC.<br><br>Defendants. | Civ. Action No. : 4:15-CV-2213<br><br>JURY TRIAL DEMANDED |

# AMENDED CLASS ACTION COMPLAINT

Lead Plaintiffs Steven Strassberg ("Strassberg") and Bruce R. Siegfried ("Siegfried" and together with Strassberg, "Plaintiffs"), by and through their counsel, individually and on behalf of all others similarly situated, for their Amended Class Action Complaint against defendants Helix Energy Solutions Group, Inc. ("Helix" or "Company") Owen Kratz ("Kratz") Anthony Tripodo ("Tripodo"), and Clifford V. Chamblee ("Chamblee"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, conversations with witnesses, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Helix Energy Solutions Group, Inc. ("Helix" or "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than the defendants who purchased or otherwise acquired Helix securities between October 21, 2014 and July 21, 2015, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials, as well as the "Promoter Defendants," as defined below.

2. Helix is a diversified, international offshore energy services company, purportedly providing specialty services to the offshore energy industry, with a focus on well intervention. The Company claims to be "an established leader in rigless offshore well intervention, providing fast, flexible and high-quality well management services" to major and independent oil and gas companies. The Company maintains a fleet of vessels that serve as work platforms for the provision of well intervention services at costs that historically have been less than offshore drilling rigs. Helix claims that its vessels derive competitive advantages from their lower operating costs, together with their ability to mobilize quickly and to maximize operational time by performing a broad range of tasks related to intervention, construction, inspection, repair and maintenance.

3. Helix provides well intervention services primarily in deep-water regions of the Gulf of Mexico and the North Sea. The Company's well intervention fleet consists of two vessels in the Gulf of Mexico and three in the North Sea. The *Q4000* is the Company's main working

vessel in the Gulf and, among other things, played a significant role in the well control and containment efforts following the April, 2010, Deepwater Horizon drilling rig explosion, which led to a major oil spill in the Gulf of Mexico.

4. Maintenance of the well intervention fleet is a critical priority for the Company since a key measure of the fleet's productivity is its vessel utilization rate. Repairs, refurbishments, upgrades, and regulatory inspections require Helix to remove its vessels from service, curtailing utilization rates. According to the Company, "[a]ny significant period of unplanned maintenance and repairs related to our vessels could have a material adverse effect on our financial position, results of operations and cash flows."

5. During the Class Period, Defendants knowingly or recklessly failed to disclose the condition of the *Q4000*'s thrusters and the potential negative impact on the vessel's utilization rates. In late October 2014, the Company informed investors that it had experienced problems with the *Q4000*'s thrusters, requiring "repairs" to be made near the end of July 2014 and resulting in approximately ten (10) days of downtime for the vessel during the third quarter of 2014. In October, 2014, Defendants led the market to believe that Helix had resolved the thrusters issue and that they expected the *Q4000* to report a "strong utilization" rate for the fourth quarter of 2014.

6. In fact, however, Helix did not repair the *Q4000*'s thrusters, but rather had employed measures which did not fully resolve the problems, but which Defendants hoped would enable the vessel to be utilized productively until April 2015, when the *Q4000* was scheduled to be dry-docked[1] and the thruster problems could be fully resolved. Defendants failed to disclose that the *Q4000* had experienced recurring problems with its thrusters dating back to the vessel's

---

[1] Dry-docking refers to the placement of a vessel in a dock that can be kept dry and that is used for building or repairing the vessel.

last dry dock in 2012. Thus, in late October, 2014, Helix misled investors into believing that the problems with the *Q4000*'s thrusters had been fully resolved in July, 2014, failing to disclose that material problems with the thrusters still existed.

7. In failing to disclose the continued existence of material problems with the *Q4000*'s thrusters, despite the July, 2014 "repairs," Defendants knowingly or recklessly deprived investors of information necessary to make an informed investment decision. Defendants engaged in a high-stakes gamble that the July 2014 stop-gap measures employed on the *Q4000*'s thrusters would enable the vessel to achieve "strong utilization" rates during the next several months, until the vessel's dry dock scheduled for April, 2015. In light of the *Q4000*'s history of recurring thruster problems since its last dry dock in 2012, of which Defendants also failed to advise investors, there was a material risk that the vessel would undergo unscheduled downtime for further "repairs" prior to the scheduled April, 2015 dry dock. Defendants failed to disclose this specific risk, which rendered inadequate the general risk disclosures stated in the Company's annual and quarterly reports filed with the SEC during the Class Period.

8. After the close of the market on July 20, 2015, Helix issued a press release, announcing its financial results for the second quarter of 2015. The Company reported $166 million in revenue, which was down approximately 46% from $305 million in the same quarter of 2014, and a net loss of $2.6 million, compared to net income of $57.8 million for the same quarter of 2014. Defendant Owen Kratz stated that the Company's "well intervention business was negatively impacted this quarter by a longer than planned *Q4000* regulatory dry dock and customer delays on the *Helix 534*…."

9. The next day, during the Company's second quarter, 2015 earnings call with investors, Helix's Finance and Treasury Director disclosed that "the *Q4000* was in dry dock for 64

days, 19 days longer than planned," and that this delay was attributable in part to "delays in the refurbishment of the *Q4000* thrusters."

10. As a result of this news, the price of Helix common stock fell $1.90, or over 16.8%, from the previous day's close of $11.30, on extremely heavy trading volume.

11. As a direct and proximate result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Helix is headquartered in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

15. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16. Lead Plaintiff Steven Strassberg purchased Helix common stock during the Class Period as set forth in the Certification and Authorization of Named Plaintiff Pursuant to Federal

Securities Laws he presented to the Court in support of his motion for appointment as lead plaintiff, attached hereto as Exhibit A, and has been damaged thereby.

17. Lead Plaintiff Bruce R. Siegfried purchased Helix common stock during the Class Period as set forth in the Certification of Proposed Lead Plaintiff Pursuant to Federal Securities Laws he presented to the Court in support of his motion for appointment as lead plaintiff, a revised Copy of which is attached hereto as Exhibit B, and has been damaged thereby.

18. Defendant Helix Energy Solutions Group, Inc. is a Minnesota corporation with its principal executive offices located at 3505 West Sam Houston Parkway North Suite 400, Houston, Texas 77043. Helix Energy's common stock trades on the NYSE under the ticker symbol "HLX."

19. Defendant Kratz served, at all times relevant hereto, as Chairman of Helix's Board of Directors, as well as President and Chief Executive Officer of the Company. According to the Company's Annual Report on Form 10-K for the period ended December 31, 2015, filed with the SEC on February 29, 2016 (the "2015 Form 10-K"), Defendant Kratz "was named Executive Chairman in October 2006 and served in that capacity until February 2008 when he resumed the position of President and Chief Executive Officer. He was appointed Chairman in May 1998 and served as Helix's Chief Executive Officer from April 1997 until October 2006. Mr. Kratz served as President from 1993 until February 1999, and has served as a director of Helix since 1990. He served as Chief Operating Officer from 1990 through 1997. Mr. Kratz joined Helix in 1984 and held various offshore positions, including saturation diving supervisor, and management responsibility for client relations, marketing and estimating.

20. Defendant Tripodo served, at all times relevant hereto, as Executive Vice President and Chief Financial Officer of the Company. According to the 2015 Form 10-K, Defendant Tripodo "was elected as Executive Vice President and Chief Financial Officer of Helix on June 25,

2008. Tripodo oversees the finance, treasury, accounting, tax, information technology and corporate planning functions. Mr. Tripodo was elected as a director of Helix in May 2015, and was also a director of Helix from February 2003 until June 2008 when he joined Helix.

21. Defendant Chamblee served, at all times relevant hereto, as Executive Vice President and Chief Operating Officer of the Company. According to the Annual Report on Form 10-K for the year ended December 31, 2014, filed with the SEC on February 18, 2015 ("2014 Form 10-K"), Defendant Chamblee "was named Executive Vice President and Chief Operating Officer of Helix in February, 2013. He served as Executive Vice President-Contracting Services of Helix from May, 2011 until February, 2013. He joined Helix's robotics subsidiary, Canyon Offshore, Inc. (Canyon), in 1997.

22. Defendants Kratz, Tripodo, and Chamblee are referred to collectively herein as the "Individual Defendants." The Individual Defendants together with the Company are referred to collectively herein as "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

***Background***

23. Helix Energy Solutions Group, Inc. is a Minnesota corporation engaged in the business of providing specialty services to the offshore energy industry, with a focus on well intervention and robotics operations. Helix maintains its principal executive offices in Houston, Texas.

24. Among Helix's principal focuses is its well-intervention business, providing engineering and managerial services such as well construction, intervention and abandonment operations in water depths ranging from 200 to 10,000 feet in the North Sea and the Gulf of Mexico.

25. As major and independent oil and gas companies expand operations in the deep water basins around the world, development of these reserves requires the installation of subsea trees. Historically, drilling rigs were typically necessary for subsea well intervention to troubleshoot or enhance production, shift sleeves, log wells or perform recompletions. The Company's vessels serve as work platforms for well intervention services at costs that are typically significantly less than offshore drilling rigs. The Company claims that the competitive advantages of its vessels are derived from lower operating costs, together with an ability to mobilize quickly and to maximize operational time by performing a broad range of tasks related to intervention, construction, inspection, repair, and maintenance. These services, according to the Company, provide a cost advantage in the development and management of subsea reservoirs.

26. Helix's well intervention segment involves the operation of five vessels. Two of these vessels, the *Q4000* and the *Helix 534,* service the Company's customers in the Gulf of Mexico, while the other three (the *Seawell*, the *Well Enhancer,* and the *Skandi Constructor)* service the Company's customers in the North Sea.

***The Q4000***

27. The *Q4000* is Helix's multi-service, semi-submersible vessel operating in the Gulf of Mexico. According to the Company's Annual Report on Form 10-K for the year ended December 31, 2013 ("2013 10-K"),[2] the *Q4000* "has set a series of well intervention 'firsts' in increasingly deeper water without the use of a traditional drilling rig." 2013 10-K at 6. The 2013 10-K continues that, "[i]n 2010, the *Q4000* served as a significant component in the Macondo well control and containment efforts." *Id.* The *Q4000* "also serves an important role in the [Helix Fast Response System] that was established in 2011." *Id.*

[2] Defendants Kratz and Tripodo signed the 2013 10-K.

28. A former Helix employee ("FE1")[3] provides further background information regarding the significance of the *Q4000* in relation to the Company's financial bottom line. According to FE1, the *Q4000* "had been the main working vessel in the Gulf" during the term of his employment. The vessel "had government contracts" requiring it "to be available," since it was considered "the lead ship out there for any kind of catastrophe." For Helix employees such as FE1, assignment to the *Q4000* provided a sense of job security since Helix required that it be constantly available for utilization. "In the oil field," according to FE1, "most of the guys don't have situations like that. You [may] go to work and [find out that] there's no work."

***Vessel Maintenance, Utilization, and Financial Impact***

29. As evidenced by its public filings with the SEC, Helix views the maintenance of its well intervention vessels to be a critical priority in light its potential financial impact on its business from prolonged disruptions in service. In its Annual Report on Form 10-K for the period ended December 31, 2014 (the "2014 10-K"), for example, Helix disclosed that "we incur significant upgrade, refurbishment and repair expenditures on our fleet from time to time," and that "[s]ome of these expenditures are unplanned." Yet the Company also has recognized that maintenance of its fleet has financial effects far beyond merely what it costs to repair or refurbish the vessels. Again, the 2014 10-K disclosed that "[d]elays in … undergoing upgrades, refurbishment or repair may result in delay in contract commencement, resulting in a loss of revenue and cash flow to us, and may cause our customers to seek to terminate or shorten the terms of their contract, and/or seek delay damages, under applicable late delivery clauses, if any." Further, Helix is aware that "[a]ny significant period of unplanned maintenance and repairs related to our vessels could

[3] FE1 worked as an electronics technical officer ("ETO") aboard the *Q4000* from September 2013 to January 9, 2015. In his role as an ETO, FE1 was responsible for overseeing and maintaining all of the vessel's electronic control systems, reporting directly to the *Q4000*'s chief engineer.

materially affect our results of operations and cash flows." Thus, Defendants are well aware that Helix's maintenance of its well intervention vessels in proper operating condition directly impacts the utilization rates of the vessels, which in turn has significant financial consequences for the well intervention segment of its business.

30. FE1 confirms the inextricable links among the Company's fleet maintenance, its vessel utilization rates, and its financial bottom line, within the specific context of the *Q4000*. If the vessel were to require repairs or refurbishment over an extended period of time, FE1 states, it would cost Helix a substantial amount of money: "That's a lot of money. They make a lot of money every day. When you look at their bottom line financially, the Q4000 has been the main working vessel in the Gulf." FE1 continues, "[t]hat vessel had contracts that kept it working for years. They were going back and plugging holes from old wells, stuff that's mandated by the government." In short, any extended period of time in which the Q4000 is not in service will have a substantial, negative financial impact on the Company's business.

31. As evidenced by their published reports, stock analysts who cover companies such as Helix which are engaged in the well intervention business generally are interested in, and attach significant weight to, utilization rates published in quarterly and annual reports filed to the SEC. Investors typically analyze these utilization statistics in evaluating and assessing a company's past financial performance over previous reporting periods and in projecting future financial performance.

32. Through their exchanges with analysts on quarterly and annual earnings calls, Defendants know of the importance investors place on utilization rates. For example, during their July 22, 2014 earnings call with analysts, Defendants used the term "utilization," or some variation thereof, more than 20 times in discussing the well intervention fleet's financial performance. Thus,

Defendants were aware that disclosure of a vessel's need for repairs that will or even may materially affect utilization rates will likely prompt an adverse market reaction.

***The Q4000's Problematic Thrusters***

33. The *Q4000* has had a history of maintenance issues relating to its thruster systems, dating back at least as far as 2012. Another former Helix employee ("FE2")[4] explains that, throughout his term of employment at the Company from June, 2013 through June, 2015, "[t]hey had some issues with the Rolls Royce thrusters they were trying to resolve and had been trying to resolve from a previous dry dock."[5]

34. The *Q4000*'s thruster system was critical to its operations because it allowed the vessel to remain stationed and operational in deep water without dropping anchor. According to FE2, the *Q4000* had to have eight thrusters, four of which were operational at any given time. The other four thrusters serve as a backup thruster system. These requirements were in place, according to FE2, to satisfy regulators that the vessel has the ability to remain stationed while anchorless and that a system of redundancies existed at all times.

35. The condition of the *Q4000*'s thrusters was a subject of concern during FE2's term of employment. FE2 states that throughout his employment, at weekly management meetings, Helix personnel discussed the *Q4000*'s thruster problems and covered those problems in weekly

---

[4] FE2 worked as the general manager of Helix's Subsea Intervention division from June 2013 to June 2015. In that role, FE2 was responsible for overseeing 27 employees resident at the Company's Houston, Texas and Aberdeen, Scotland locations, and for supervising the installation of critical systems on board vessels assigned to the Gulf of Mexico, including the *Q4000*. He participated in weekly meetings to discuss Company business and regularly received electronic updates and memoranda.

[5] According to the 2014 10-K, prior to the then anticipated April, 2015 dry-docking, the last time the *Q4000* was in dry-dock was during 2012.

written reports that FE2 read. Despite these ongoing concerns, Defendants failed to disclose the problem with the thruster system until late October, 2014.

## FALSE AND MISLEADING STATEMENTS

36. No later than the beginning of the third quarter of 2014, the *Q4000*'s thruster problems that had afflicted the *Q4000* since its 2012 dry-dock had become sufficiently acute to require repairs that affected its third-quarter, 2014, utilization. Yet even as the Company lost ten (10) utilization days in the third-quarter of 2014, Defendants still failed to disclose the issue with the *Q4000*'s thruster system.

37. According to FE2, the Company scheduled the *Q4000* for dry dock in 2015, in part, to resolve the recurring problems with the vessel's thrusters.

38. On October 20, 2014, the Company filed a Current Report on Form 8-K ("October 20 8-K") with the SEC, attaching a press release announcing Helix's financial results for the third quarter of 2014 ("October 20 Press Release").[6] In addition, Defendants attached to the October 20 8-K slides for use during the Company's earnings call scheduled for the next day ("October 21 Slides").

39. In the October 20 Press Release, Defendants stated, in pertinent part, that "[v]essel utilization for the *Q4000* in the Gulf of Mexico was slightly down – 89% utilization in the third quarter of 2014 compared to 90% in the second quarter of 2014 – due to thruster repairs."

40. On Slide 10 of the October 21 Slides, Defendants stated, once again that "*Q4000* was 89% utilized during Q3; vessel down 10 days for thruster repairs." Slide 10 also stated that "[b]oth vessels [*i.e.*, the *Q4000* and the *H534*] are expecting strong utilization in Q4 of 2014."

---

[6] Defendant Tripodo signed the October 20 8-K.

41. On October 21, 2014, the Company held its earnings conference call ("October 21, Call") to discuss its financial results for the third quarter of 2014 with analysts. During the October 21 Call that all of the Individual Defendants attended, with respect to Slide 10 of the October 21 Slides, Terrence Jamerson, the Company's Director of Finance and Investor Relations, stated that ". . . in the Gulf of Mexico we have had high utilization on both of our vessels. . . . For Q3 the *Q4000* had another strong quarter with 89% utilization. She was down approximately 10 days near the end of July for thruster repairs."

42. Thus, on October 21, 2014, Defendants led the market to believe that the *Q4000*'s thruster problems had been fully resolved by the late July 2014 "repairs." Also during the October 21 Call, Defendant Kratz stated that the Company had scheduled the Q4000 for dry dock in "early Q2."

43. In fact, however, according to FE2, Defendants statements about the Q4000's thruster system in their October 21 and 22, 2015 disclosures were materially false and misleading because Defendants knew or recklessly disregarded that the *Q4000*'s thruster system issue had existed since its 2012 dry-dock and that Helix had not fully resolved the *Q4000*'s thruster problems with the late July, 2014 "repairs." Rather, the Company had employed measures which did not fully resolve the problems, but which Defendants hoped would enable the *Q4000* to be utilized productively until April, 2015 when the Company scheduled the *Q4000* for dry-dock.

44. Having disclosed the existence of the *Q4000*'s thruster problems in late October, 2014, and of the "repairs" which were intended to address them, Defendants assumed were duty-bound (1) to make a complete disclosure regarding the condition of the *Q4000*'s thrusters, including the continued existence of the recurring thruster problems since the 2012 dry-dock and the Company's intention to address fully the thruster problems during the upcoming dry dock in

"early Q2" of 2015; and (2) to update its risk disclosures to cover the specific risk posed by the vessel's continued operation in light of the persistence of such thruster problems. The Company failed to satisfy either of these duties.

***Defendants Fail to Disclose and to Update Risk Disclosures Relating to the Q4000's Thrusters***

45. In addition, during the Class Period, Defendants failed to disclose the continuing issues with the *Q4000*'s thrusters and to include those material problems in their risk disclosures concerning that vessel's continued operation and utilization.

46. On October 22, 2014, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended September 30, 2014 (the "3Q 10-Q").[7] In the 3Q 2014 10-Q, Defendants fail to mention the *Q4000*'s ongoing thruster problems.

47. In its "Management's Discussion and Analysis" section, Defendants state that "[o]ur actual results could differ materially from those anticipated in any forward-looking statements as a result of a variety of factors, including those described in Item 1A. 'Risk Factors' in our 2013 Form 10-K."

48. Defendants included in their discussion of "Risk Factors" in the 2013 10-K the following risk factors relating to vessel utilization:

> ***Vessel upgrade, repair and construction projects are subject to risks, including delays, cost overruns, and failure to secure drilling contracts.***
>
> We are constructing two newbuild semisubmersible well intervention vessels, the Q5000 and the Q7000. We are also constructing additional ROVs and trenchers. We may also commence the construction of additional vessels for our fleet from time to time without first obtaining service contracts covering any such vessel. Our failure to secure service contracts for vessels under

[7] Defendants Kratz and Tripodo signed the 3Q 2014 10-Q.

> construction prior to deployment could adversely affect our financial position, results of operations and cash flows.
>
> Depending on available opportunities, we may construct additional vessels for our fleet in the future. In addition, we incur significant upgrade, refurbishment and repair expenditures on our fleet from time to time. Some of these expenditures are unplanned. These projects are subject to risks of delay or cost overruns inherent in any large construction project resulting from numerous factors, including the following: shortages of equipment, materials or skilled labor; unscheduled delays in the delivery of ordered materials and equipment; unanticipated increases in the cost of equipment, labor and raw materials, particularly steel; weather interferences; difficulties in obtaining necessary permits or in meeting permit conditions; design and engineering problems; political, social and economic instability, war and civil disturbances; delays in customs clearance of critical parts or equipment; financial or other difficulties or failures at shipyards and suppliers; disputes with shipyards and suppliers; and work stoppages and other labor disputes.
>
> Delays in the delivery of vessels being constructed or undergoing upgrade, refurbishment or repair may result in delay in contract commencement, resulting in a loss of revenue and cash flow to us, and may cause our customers to seek to terminate or shorten the terms of their contract, or seek delay damages, under applicable late delivery clauses, if any. For example, the recently announced contracts for our chartered vessels in Brazil have penalty provisions for late delivery. In the event of termination of one of these contracts, we may not be able to secure a replacement contract on as favorable terms, if at all. The estimated capital expenditures for vessels, upgrades, refurbishments and construction projects could materially exceed our planned capital expenditures. Moreover, our vessels undergoing upgrade, refurbishment and repair may not earn a day rate during the period they are out-of-service.
>
> Additionally, as vessels age, they are more likely to be subject to higher maintenance and repair activities and thus suffer lower levels of utilization. Any significant period of unplanned maintenance and repairs related to our vessels could materially affect our results of operations and operating cash flows.

49. Despite their disclosure of the general risk that a vessel may require "unplanned maintenance and repairs," Defendants' risk disclosures in its 2013 10-K, as incorporated into the Company's 3Q 10-Q, were false and misleading for failing to disclose the specific risk to the

*Q4000*'s utilization that the vessel's continuing thruster problems posed. More, these risk disclosures were false and misleading for violating Item 303 of Regulation S–K, requiring the disclosure of known trends, demands, commitments, events, and uncertainties that are reasonably likely to have a materially adverse effect on a company's liquidity, net sales, capital resources, revenues, or income from continuing operations, 17 C.F.R. § 229.303. The risk disclosures were false and misleading because Defendants knew or were reckless in not knowing of the continuing existence of the problems with the *Q4000*'s thruster systems.

50. On February 17, 2015, the Company filed with the SEC a Current Report on Form 8-K, attaching a press release of the same day ("February 17 Press Release"), announcing Helix's financial results for the fourth quarter of and full year, 2014 ("February 17 8-K").[8] Defendants attached to the February 17 8-K slides for use during the Company's earnings call scheduled for the next day ("February 18 Slides").

51. In the February 17 Press Release, the Company omitted any reference to the *Q4000*'s thruster problems and, therefore, fails to disclose the continuing issues with the vessel's thrusters and the ongoing risk those issues posed to the Company's utilization of the *Q4000* in the first quarter of 2015.

52. During the earnings call Defendants conducted on February 18, 2015 ("February 18 Call"), once again, Defendants failed to mention the ongoing issues with the *Q4000*'s thruster system. Once again, therefore, Defendants failed to disclose the condition of the vessel's thrusters. The Company did confirm, however, that the *Q4000* was scheduled for dry dock in April, 2015.

[8] Defendant Tripodo signed the February 17 8-K.

53. Also on February 18, 2015, the Company filed 2014 10-K.[9] Once again, in the 2014 10-K, Defendants omit any reference to the *Q4000*'s ongoing thruster system problems.

54. Just as the 2013 10-K had disclosed, the 2014 10-K includes a section on "Risk Factors" that includes the following:

> ***Vessel upgrade, repair and construction projects are subject to risks, including delays, cost overruns, and failure to secure drilling contracts.***
>
> We are constructing two newbuild semisubmersible well intervention vessels, the Q5000 and the Q7000. We are also constructing additional ROVs and trenchers. We may also commence the construction of additional vessels for our fleet from time to time without first obtaining service contracts covering any such vessel. Our failure to secure service contracts for vessels under construction prior to deployment could adversely affect our financial position, results of operations and cash flows.
>
> Depending on available opportunities, we may construct additional vessels for our fleet in the future. In addition, we incur significant upgrade, refurbishment and repair expenditures on our fleet from time to time. Some of these expenditures are unplanned. These projects are subject to risks of delay or cost overruns inherent in any large construction project resulting from numerous factors, including the following: shortages of equipment, materials or skilled labor; unscheduled delays in the delivery of ordered materials and equipment; unanticipated increases in the cost of equipment, labor and raw materials, particularly steel; weather interferences; difficulties in obtaining necessary permits or in meeting permit conditions; design and engineering problems; political, social and economic instability, war and civil disturbances; delays in customs clearance of critical parts or equipment; financial or other difficulties or failures at shipyards and suppliers; disputes with shipyards and suppliers; and work stoppages and other labor disputes.
>
> Delays in the delivery of vessels being constructed or undergoing upgrade, refurbishment or repair may result in delay in contract commencement, resulting in a loss of revenue and cash flow to us, and may cause our customers to seek to terminate or shorten the terms of their contract, or seek delay damages, under applicable late delivery clauses, if any. For example, the contracts for our chartered

[9] Defendants Kratz and Tripodo signed the 2014 10-K.

> vessels in Brazil have penalty provisions for late delivery to Petrobras of the vessels which escalate with further delay, and if the vessels are late in delivery to Petrobras beyond a certain date, the contracts also may be terminated. In the event of termination of these and other contracts, we may not be able to secure a replacement contract on as favorable terms, if at all. Moreover, if the contract with Petrobras were to be canceled, we would still be responsible for the charter costs of the two monohull vessels we have contracted to perform this work in Brazil.
>
> The estimated capital expenditures for vessels, upgrades, refurbishments and construction projects could materially exceed our planned capital expenditures. Moreover, our vessels undergoing upgrades, refurbishment and repair may not earn a day rate during the period they are out of service. Additionally, as vessels age, they are more likely to be subject to higher maintenance and repair activities and thus suffer lower levels of utilization. Any significant period of unplanned maintenance and repairs related to our vessels could materially affect our results of operations and cash flows.

55. Despite their disclosure of the general risk that a vessel may require "unplanned maintenance and repairs," Defendants' risk disclosures in its 2014 10-K were false and misleading for failing to disclose the specific risk to the *Q4000*'s utilization that the vessel's continuing thruster problems posed. More, these risk disclosures were false and misleading for violating Item 303 of Regulation S–K, requiring the disclosure of known trends, demands, commitments, events, and uncertainties that are reasonably likely to have a materially adverse effect on a company's liquidity, net sales, capital resources, revenues, or income from continuing operations, 17 C.F.R. § 229.303. The risk disclosures were false and misleading because Defendants knew or were reckless in not knowing of the continuing existence of the problems with the *Q4000*'s thruster systems.

***The Company's April 2015 Announcement that the Q4000 is in Dry Dock***

56. On April 21, 2015, the Company filed with the SEC a Current Report on Form 8-K ("April 21 8-K"), attaching a press release, announcing Helix's financial results for the first

quarter of 2015.[10] Attached to the Form 8-K were slides for use during the Company's earnings call scheduled for the next day ("April 21 18 Slides").

57. On Slide 18 of the April 21 Slides, Defendants stated that "[t]he *Q4000* (currently in dry dock for an estimated 45 days) is expected to have good utilization in 2015."

58. During the earnings call Defendants conducted on April 22, 2015 ("April 22 Call"), once again, Defendants failed to mention the ongoing issues with the *Q4000*'s thruster system. During the April 22 Call, Defendant Tripodo stated "[i]n the Gulf of Mexico, the *Q4000* is expected to have fairly good utilization after her dry dock which is currently underway and expected to be completed in mid-May." Once again, however, as the *Q4000* underwent regulatory inspection and repairs in dry-dock, Defendants failed, once again, to disclose the existence of that vessel's thruster problems, the repairs the *Q4000* was undergoing to resolve those issues or the effect the thruster repairs were having, extending the duration of the April, 2015 dry-dock.

## THE TRUTH EMERGES

***The Company Discloses that Thruster Problems Responsible for Q4000's Extended Dry Dock***

59. After the close of the market on July 20, 2015, the Company filed with the SEC a Current Report on Form 8-K ("July 20 8-K"),[11] attaching a press release, announcing Helix's financial results for the second quarter of 2015 ("July 20 Press Release"). In addition, Defendants attached to the July 20 8-K slides for use during the earnings conference call they would conduct the next day ("July 21 Slides").

60. In the July 20 press release, the Company reported $166 million in revenue, which was down approximately 46% from $305 million in the same quarter of 2014, and a net loss of

[10] Defendant Tripodo signed the April 21 8-K.

[11] Defendant Tripodo signed the July 20 8-K.

$2.6 million, compared to net income of $57.8 million for the same quarter of 2014. Defendant Kratz stated that the Company's "well intervention business was negatively impacted this quarter by a longer than planned *Q4000* regulatory dry dock and customer delays on the *Helix 534*…." The press release also stated that "[t]he *Q4000* was in dry-dock for 64 days during the quarter, while the *H534* utilization decreased to 55% in the second quarter compared to 71% in the first quarter of 2015."

61. On Slide 6 of the July 21 Slides, Defendants stated, "[w]ell Intervention – Q2 2015: 63% utilization of active well intervention vessels: Gulf of Mexico 42% utilization (2 vessels); … *Q4000* in dry dock 64 days (45 days planned), returned to service in June."

62. The next day, during the July 21, 2015 earnings call ("July 21 Call"), Erik Staffeldt, Helix's Finance and Treasury Director, stated, "[i]n the Gulf of Mexico the *Q4000* was in dry dock for the 64 days, 19 days longer than planned. We experienced the combination of standard shipyard delays and delays in the refurbishment of the *Q4000* thrusters."

63. As a result of this news, the price of Helix common stock fell $1.90, or over 16.8%, from the previous day's close of $11.30, on extremely heavy trading volume.

64. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**ADDITIONAL SCIENTER ALLEGATIONS**

65. Defendant Chamblee sold shares of Helix suspicious in timing and amount. From the beginning of 2012 until the beginning of the Class Period on October 21, 2014, Defendant Chamblee sold no shares of Helix common stock on the open market. During the Class Period, however, on October 29, 2014, Defendant Chamblee sold 15,000 shares of Helix common stock,

or approximately 21% of his total shares held at the time, at the price of $26.61 per share in a single transaction, for total proceeds of $399,150.[12] This sale is out of line with Defendant Chamblee's prior trading practices and/or is calculated to maximize personal profit.

66. Defendant Tripodo also engaged in the sale of Helix common stock on the open market during the Class Period.[13] On November 5, 2014, Defendant Tripodo sold 10,000 shares at the price of $25.89 per share, for total proceeds of $258,900. On November 13, 2014, he sold 8,037 shares at the price of $26.83 per share, for total proceeds of $215,632.71. On May 21, 2015, he sold 4,561 shares at the price of $16.60 per share, for total proceeds of $75,712.60. The timing of these transactions was suspicious.

## CLASS ACTION ALLEGATIONS

67. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Helix securities traded on the New York Stock Exchange ("NYSE") during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

68. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Helix securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be

[12] The Company confirmed the above transaction in a Form 4 filed with the SEC on October 30, 2014.

[13] The Company confirmed each of the following transactions in a Form 4 filed with the SEC on November 7, 2014, November 14, 2014, and May 22, 2015, respectively.

ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Helix or its transfer agent maintains a list of record owners, enabling it to identify other members of the Class and to issue notice of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

69. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

71. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Helix;

(c) whether the Individual Defendants caused Helix Energy to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Helix securities during the Class Period were

artificially inflated because of the Defendants' conduct complained of herein; and,

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

96. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

97. Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine. At all relevant times, the market for Helix common stock was efficient for the following reasons, among others:

(a) For most of the Class Period, Helix's shares of common stock traded on the NYSE;

(b) As a regulated issuer, Helix filed periodic public reports with the SEC;

(c) Helix regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

(d) During the Class Period, the average daily trading volume in Helix's shares was 1,627,257.98 shares or weekly average trading volume of approximately 1,655,692.5 shares. As of March 9, 2015, the company had 105,909,633 shares of common stock issued and outstanding of which insiders owned 7,290,414 shares. With a public float of approximately

98,619,219 million shares, on average, 1.7 % of the float traded daily and approximately 1.7 % of the float trading weekly, establishing a strong presumption that the market for its stock was;

(e) New company specific information was rapidly reflected in the Company's stock price; and

(f) During the Class Period, as many as fifty-eight (58) market makers made a market in the Company's stock.

98. As a result of the foregoing, the market for Helix's common stock promptly digested current information regarding Helix from all publicly available sources and reflected such information in Helix's stock price. Under these circumstances, all purchasers of Helix's common stock during the Class Period suffered similar injury through their purchase of Helix's common stock at artificially inflated prices, and a presumption of reliance applies. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

99. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

100. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

101. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Helix securities during the Class Period.

103. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Helix securities. Plaintiffs and the Class would not have purchased Helix securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## SECOND CLAIM
## Violation of Section 20(a) of the Exchange Act
## Against the Individual Defendants

104. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

105. Lead Plaintiffs sue the Individual Defendants herein as controlling persons of Helix.

106. By virtue of their high-level position, agency, and their ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements

disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violators, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading. In particular, the Individual Defendants had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

107. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Helix and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein. Those Individual Defendants exercised that power.

108. As set forth above, Helix violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.

109. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

110. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiffs Strassberg and Siegfried as Lead Plaintiffs and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY TRIAL DEMANDED**

111. Plaintiffs hereby demand a trial by jury.

Dated: March 14, 2016

Respectfully Submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Keith R. Lorenze
Jacob Goldberg
Keith R. Lorenze
TX Bar 24046313 / SDTX Bar 621638
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
T: (215) 600-2817
F: (212) 202-3827
Email: jgoldberg@rosenlegal.com
klorenze@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
Philip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
T: (212) 686-1060
F: (212) 202-3827
Email: lrosen@rosenlegal.com
pkim@rosenlegal.com

***Lead Counsel for Lead Plaintiffs and the Class***

**PAYNE MITCHELL LAW GROUP**

R. Dean Gresham, Esq. (TX Bar 24027215)
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
Tel: (214) 252-1888
Fax: (214) 252-1889
Email: dean@paynemithcell.com

***Liaison Counsel for Plaintiffs and Class***

**MORGAN & MORGAN P.C.**
Peter Safirstein
Roger A. Sachar, Jr.
28 West 44th Street
Suite 2001
New York, New York 10036
Tel: (212) 564-1637

***Additional Counsel for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that, on March 14, 2015, I electronically filed the foregoing ***Amended Class Action Complaint*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Keith R. Lorenze*
Keith R. Lorenze
101 Greenwood Avenue, Suite 203
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-M: jgoldberg@rosenlegal.com

***Lead Counsel for Lead Plaintiffs and the Class***