United States District Court
Southern District of Texas
**ENTERED**
February 14, 2017
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PARVIZ IZADJOO, | § | |
| On behalf of himself and all others | § | |
| similarly situated, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. H-15-2213 |
| VS. | § | |
| | § | |
| HELIX ENERGY SOLUTIONS GROUP, | § | |
| INC., *et al.* | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

The putative class members in this federal securities action are investors in Houston-based Helix Energy Solutions Group, Inc., an off-shore energy services company. The plaintiffs allege that during the period from October 21, 2014 to July 21, 2015, Helix misrepresented the length of time that one of its well intervention vehicles would be idle during 2015. In July 2015, Helix reported that the vessel's time in a dry dock lasted 64 days instead of the estimated 45 days. Helix also reported revenue losses and a downward forecast of revenue from an overall slowdown in the oil and gas market. On the same day as the announcement, Helix stock price declined approximately 16.8%.

The plaintiffs sued Helix and three company officers. The plaintiffs allege securities fraud under § 10(b) and § 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and under Rule 10b–5, 17 C.F.R. § 240.10b–5. They seek damages for the decline of their share value. (Docket Entry No. 23).

The defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 9(b),

1

and under the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4(b)(2).  (Docket

Entry No. 28).  They argue that the complaint fails to allege a material misrepresentation, fails to

allege facts giving rise to a strong inference of scienter, and fails plausibly to allege loss causation.

The plaintiffs responded, and the defendants replied.  (Docket Entry Nos. 30, 31).  Based on the

pleadings; the motion, response, and reply; the record; and the relevant law, the defendants' motion

to dismiss is granted.  The dismissal is without prejudice and with leave to amend, no later than

**March 17, 2017**.

The reasons for these rulings are explained below.

I.      **Background**

A.      **The Complaint Allegations**

Helix maintains a fleet of five vessels that provide well intervention services, primarily in

deep-water regions of the Gulf of Mexico and the North Sea.  (Docket Entry No. 23 ¶¶ 24–26).

According to the complaint, Helix's *Q4000* is its main vessel in the Gulf of Mexico.  (*Id*. ¶ 27).

Independent oil and gas companies contract with Helix to use its vessels as platforms to repair,

maintain, and abandon underwater oil wells at a fraction of the cost and time required to use

traditional oil rigs.  (*Id*. ¶¶ 24–25).  The plaintiffs allege that the availability of Helix's vessels has

a material effect on its financial position.  (*Id*. ¶ 29).  Helix is to apprise investors of expected and

actual vessel utilization rates, which may be adversely affected by the need for vessel repairs,

upgrades, or inspections, or by economic downturns.  (*Id*. ¶¶ 31–32).

The plaintiffs allege that in October 2014, Helix disclosed in its third-quarter earnings report

that the *Q4000* had an 89% utilization rate during that quarter and had been idle for 10 days in July

2014 "due to thruster repairs."  (*Id*. ¶¶ 39, 41).  The report informed investors that Helix expected

the *Q4000* to have "strong utilization" through the rest of 2014 and was scheduled for dry dock early in the second quarter of 2015.  (*Id.* ¶¶ 40, 42).

In the 2014 fourth-quarter earnings report issued in February 2015, Helix reported an 86% utilization rate for the *Q4000*, with idle time from "mechanical problems related to the redeployment of its intervention riser system" and from "repairs incurred after being struck by a supply boat." (Docket Entry No. 28, Ex. 3 at 80).[1]  Helix officers on the earnings call allegedly said nothing about thruster problems affecting the *Q4000*.  (Docket Entry No. 23 ¶¶ 51–52).  The officers reported that they expected the *Q4000* to have "good utilization in 2015," excluding the scheduled dry dock. (Docket Entry No. 28, Ex. 3 at 93).

In the 2015 first-quarter earnings report issued in April 2015, Helix reported that the *Q4000* had been "on-hire for the entire quarter" and had a 91% utilization rate.  (*Id.*, Ex. 4 at 20).  Helix officers on the earnings call reported that the *Q4000* intervention riser system had encountered "mechanical issues" in January.  (*Id.* at 24).  The officers did not mention thruster problems on the call.  (Docket Entry No. 23 ¶ 58).  The Helix officers announced that the *Q4000* was "currently in dry dock for an estimated 45 days" and was "expected to have good utilization in 2015."  (*Id.* ¶ 57).

In the 2015 second-quarter earning report issued in July 2015, Helix reported that the *Q4000* had "experienced the combination of standard shipyard delays and delays in the refurbishment of the *Q4000* thrusters."  (*Id.*).  During an earnings call on July 21, 2015, Helix announced that the *Q4000* was in dry dock for 64 days, 19 days longer than the originally estimated 45 days.  (*Id.* ¶ 62). On that same date, Helix common stock fell $1.90, or 16.8%, from the previous day's close of

---

[1]  The court considers Helix's earnings call presentation slides under its authority to "consider documents integral to and explicitly relied on in the complaint, that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint."  *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001).

$11.30.  (*Id*. 63).

The parties dispute the significance of the announcement of the 19-day delay in the time the *Q4000* was in dry dock.  The defendants argue that "the Complaint contains no facts indicating that the prediction [of a 45-day dry dock] was anything other than sincerely believed when made." (Docket Entry No. 28 at 13).  Helix contends that it routinely warned investors about the unpredictable timing of dry dock work and that it forewarned investors that two months was a "typical" period for dry docking.  (*Id*. at 5).  The defendants also argue that the complaint provides a facially insufficient basis to infer that the *Q4000* had thruster problems during the class period, that the company's officers knew about or suspected thruster problems, or that thruster problems delayed the 2015 dry dock period.  (*Id*. at 9–18).

The plaintiffs contend that Helix officers knew or recklessly disregarded that the *Q4000*'s ongoing thruster problems would require significant repairs and extend the 2015 dry dock period beyond the estimated 45 days.  (*See, e.g.*, *id*. ¶¶ 33–35, 42–44, 58).  The plaintiffs rely on a confidential witness, known in the complaint as FE2,[2] who stated that through June 2015, Helix "had some issues with the Rolls Royce thrusters they were trying to resolve and had been trying to resolve from a previous dry dock."  (*Id*. ¶ 33).  This witness also stated that "at weekly management meetings, Helix personnel discussed the *Q4000*'s thruster problems and covered those problems in weekly written reports that FE2 read."  (*Id*. ¶¶ 35).

_____

[2] The complaint describes FE2 as "the general manager of Helix's Subsea Intervention division from June 2013 to June 2015.  In that role, FE2 was responsible for overseeing 27 employees resident at the Company's Houston, Texas and Aberdeen, Scotland locations, and for supervising the installation of critical systems on board vessels assigned to the Gulf of Mexico, including the *Q4000*.  He participated in weekly meetings to discuss Company business and regularly received electronic updates and memoranda."  (Docket Entry No. 23 ¶ 33 n.4).  The complaint does not specify who else attended these weekly meeting or to whom FE2 reported.

4

The plaintiffs allege that some of the defendant officers "sold shares of Helix suspicious in timing and amount." (*Id*. ¶ 65). Clifford Chamblee, Helix's Executive Vice President and Chief Operating Officer, did not sell any of his stock in the three years before the class period, but he sold 15,000 shares of common stock during the class period. (*Id*.). Anthony Tripodo, Helix's Executive Vice President and Chief Financial Officer, sold over 22,000 shares of common stock during the class period. (*Id*. ¶ 66). The plaintiffs argue that these "stock sales are suspicious in nature, and contribute to the strong inference of scienter." (Docket Entry No. 30 at 21).

### B.    The Allegedly Fraudulent Statements and Omissions

The plaintiffs allege that during the class period—between October 21, 2014 and July 21, 2015—Helix affirmatively or by omission materially misrepresented its financial condition in its: (1) 2014 Form 8-K and related press release and earnings call; (2) 2014 third quarter Form 10-Q; (3) 2014 Form 10-K; (4) February 2015 Form 8-K and related press release and earnings call; and (5) April 2015 Form 8-K and related press release and earnings call. Each alleged misrepresentation or omission is summarized below.

    (A)      Helix filed a Form 8-K report on October 20, 2014. (Docket Entry No. 23 ¶ 38). In the accompanying press release and earnings call presentation Helix stated that "[v]essel utilization for the *Q4000* in the Gulf of Mexico was slightly down—89% utilization in the third quarter of 2014 compared to 90% in the second quarter of 2014—due to thruster repairs." (*Id*. ¶¶ 39–40). The earnings call presentation included statements that the *Q4000* was expecting "strong utilization in Q4 of 2014." (*Id*. ¶ 40). On the call, Helix President and Chief Executive Officer Owen Kratz announced that the *Q4000* was scheduled for dry dock maintenance in "early Q2."

(*Id*. ¶ 42).  Mr. Kratz advised that the dry dock period would last for "plus or minus 45 days," but this was "just an estimate because you never know once you get into dry dock."  (Docket Entry No. 28, Ex. 3 at 52, 54)[3].  Mr. Tripodo signed the Form 8-K.  The signature certified the report's material accuracy, as the Sarbanes-Oxley Act of 2002 (SOX) required.  (*Id*. ¶ 38 n.6).

(B)     Helix filed a third-quarter Form 10-Q on October 22, 2014.  (*Id*. ¶ 46).  The filing did not mention thruster issues affecting the *Q4000*.  (*Id*.).  Mr. Kratz and Mr. Tripodo signed the certification form.  (*Id*. ¶ 46 n.7).

(C)     Helix filed its 2014 Form 10-K on February 18, 2015.  (*Id*. ¶ 53).  The filing did not mention thruster issues affecting the *Q4000*.  (*Id*.).  Mr. Kratz and Mr. Tripodo again signed the certification form.  (*Id*. ¶ 53 n.9).

(D)     Helix filed a current report on Form 8-K on February 17, 2015.  (*Id*. ¶ 50).  The accompanying press release and earnings call presentation did not mention thruster issues affecting the *Q4000*.  (*Id*. ¶¶ 51–52).  Mr. Tripodo signed the certification form.  (*Id*. ¶ 50 n.8).

(E)     Helix filed a Form 8-K report on April 21, 2015.  (*Id*. ¶ 56).  The accompanying earnings call presentation stated that "[t]he *Q4000* (currently in dry dock for an estimated 45 days) is expected to have good utilization in 2015."  (*Id*. ¶ 57).  Mr. Tripodo signed the certification form.  (*Id*. ¶ 56 n.10).

---

[3]   The court considers the transcript of Helix's earnings call under its authority to "consider documents integral to and explicitly relied on in the complaint, that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint."  *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001).

The plaintiffs acknowledge that both Helix's 2013 Form 10-K and 2014 Form 10-K identified certain risk factors relating to vessel utilization.  Both filings stated:

> [W]e incur significant upgrade, refurbishment and repair expenditures on our fleet from time to time.  Some of these expenditures are unplanned.  These projects are subject to risks of delay or cost overruns inherent in any large construction project resulting from numerous factors, including the following: shortages of equipment, materials or skilled labor; unscheduled delays in the delivery of ordered material and equipment; unanticipated increases in the cost of equipment, labor and raw materials, particularly steel; weather interferences ; difficulties in obtaining necessary permits or in meeting permit conditions; design and engineering problems; political, social and economic instability, war and civil disturbances; delays in customs clearance of critical parts or equipment; financial or other difficulties or failures at shipyards and suppliers; disputes with shipyards and suppliers; and work stoppages and other labor disputes.
>
> Delays in the delivery of vessels being constructed or undergoing upgrade, refurbishment or repair may result in delay in contract commencement, resulting in a loss of revenue and cash flow to us, and may cause our customers to seek to terminate or shorten the terms of their contract, or seek delay damages, under applicable late delivery clauses if any. . . .  The estimated capital expenditures for vessels, upgrades, refurbishments and construction projects could materially exceed our planned capital expenditures.  Moreover, our vessels undergoing upgrade, refurbishment and repair may not earn a day rate during the period they are out-of-service.
>
> Additionally, as vessels age, they are more likely to be subject to higher maintenance and repair activities and thus suffer lower levels of utilization.  Any significant period of unplanned maintenance and repairs related to our vessels could materially affect our results of operations and operating cash flows.

(*Id*. ¶¶ 48, 54).  Both the 2014 and 2013 Form 10-K stated that "[a] dry dock and related recertification process typically lasts one to two months, a period during which the vessel is idle and generally not available to earn revenue." (Docket Entry No. 28, Ex. 2 at 36, 57).  The plaintiffs note that Helix's 2014 third-quarter Form 10-Q incorporated by reference the risk factors from the 2013 Form 10-K.  (*Id*. ¶¶ 47–48).  The plaintiffs argue that "[d]espite their disclosure of the general risk that a vessel may require 'unplanned maintenance,' Defendants' risk disclosures in its [2013 and] 2014 [Form] 10-K were false and misleading for failing to disclose the specific risk to the *Q4000*'s

utilization that the vessel's continuing thruster problems posed." (*Id*. ¶ 55).

### C.     The Corrective-Disclosure Allegations

After the market closed on July 20, 2015, Helix filed a Form 8-K report, attaching a press release and a slide presentation for an earnings call the next day. (Docket Entry No. 23 ¶ 59). The press release reported a 46% drop in net income from the same quarter the previous year and a net loss of $2.6 million for the second quarter of 2015. (*Id*. ¶ 60). The press release noted that Helix's "well intervention business was negatively impacted this quarter by a longer than planned *Q4000* regulatory dry dock and customer delays on the *Helix 534*." (*Id*.). The earnings presentation also forecast a downward trend in revenues due to a slowdown in the oil and gas market. (Docket Entry No. 28, Ex. 4 at 90). On the earnings call, Helix's Finance and Treasury Director Erik Staffeldt stated that "[i]n the Gulf of Mexico the *Q4000* was in dry dock for 64 days, 19 days longer than planned. We experienced the combination of standard shipyard delays and delays in the refurbishment of the *Q4000* thrusters." (Docket Entry No. 23 ¶ 62). On the same day, Helix common stock fell $1.90, or over 16.8%. The plaintiffs attribute the drop to the announcement of the dry dock delay. (*Id*. ¶¶ 63–64).

The defendants argue that the complaint fails to identify a material misrepresentation because the *Q4000*'s thrusters did not materially impact the vessel's utilization rates and the length of the dry dock did not materially exceed the two-month period that Helix's filings warned was "typical." (Docket Entry No. 28 at 9–18). They argue that the plaintiffs have not plausibly alleged fraud because, even if the *Q4000* had thruster problems, the SOX certifications, stock sales, and alleged statements from the confidential witnesses do not support an inference that Helix officers knew about or recklessly disregarded the condition of the thrusters or the likely impact on earnings. (*Id*.

at 18–24).  Finally, the defendants argue that the complaint does not plausibly allege loss causation because the news of the refurbished thrusters could not have "made any difference to investors." (*Id*. at 25).   On the same date that Helix reported the thruster refurbishment, it also reported significant revenue losses and downward forecasts from an overall slowdown in the oil and gas market.  (*Id*. at 24–25).

Each argument and response is analyzed under the appropriate legal standards.

## II.      The Legal Standards for a Motion to Dismiss

### A.      Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008).  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court elaborated on the pleading standards discussed in *Twombly*.  The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).  *Iqbal* explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  (citing *Twombly*, 550 U.S. at 556).

"[I]n deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).  A court may "consider documents integral to and explicitly relied on in the complaint, that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001) (internal quotation marks omitted). Consideration of documents attached to a defendant's motion to dismiss is limited to "documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Scanlan v. Tex. A & M. Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000)).  In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with the agency.  *Lovelace*, 78 F.3d at 1018 n.1.  These documents may be considered to determine what statements they contain, not as proof of their truth or falsity.  *Id.*  The court may consider such extrinsic materials as matters of public record without converting the motion into one seeking summary judgment.  *See Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988) (quoting 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366).

### B.    Section 10(b) of the Exchange Act and Rule 9(b)

Under § 10(b) of the Securities and Exchange Act of 1934, "[i]t shall be unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary

or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  SEC Rule 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading."  17 C.F.R. § 240.10b–5.  Section 10(b) has been interpreted to provide a right of action to securities purchasers or sellers injured by its violation.  *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007).  "But the statutes make these latter actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (internal citations omitted).

To state a private cause of action under § 10(b), a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005) (internal citations omitted).  For fraud claims, including securities fraud claims, Rule 9(b) requires the complaint to "state with particularity the circumstances constituting the fraud."  Fed. R. Civ. P. 9(b).  "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out."  *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003); *see also Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006).  In the Fifth Circuit, the Rule 9(b) standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent."  *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).

### 1.    Materiality

To be actionable, a misrepresentation of fact, including an omission, must be material. Materiality is not a test of "statistical significance." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43–44 (2011).  Instead, it requires a "fact-specific inquiry . . . of [the] source, content, and context" of the alleged statement or omission.  *Id.*  "A fact is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important' in making an investment decision. . . .  For an omission to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 213–14 (5th Cir. 2004) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (emphasis removed)).  Materiality can be determined at the pleading stage, and "many [securities] cases have been properly dismissed on the pleadings for lack of materiality."  *Id.* at 216 (citing *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 369 n.13 (3d Cir. 1993) (If "alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality [it is] appropriate for the district court to rule that the allegations are inactionable as a matter of law.") (citations omitted; insertion in original)).

The PSLRA establishes a "safe harbor" protecting a forward-looking statement from liability unless plaintiffs prove that it was made with actual knowledge of falsity. 15 U.S.C. § 78u–5(c)(1)(A).  A statement is forward-looking if it is:

> (A)    a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

> (B)    a statement of the plans and objectives of management for future operations, including plans or objective relating to the products or services of the issuer; [or]
>
> (C)    a statement of future economic performance, including any such statement contained in a discussion and analysis of the financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission . . . .

*Id.* § 78u–5(i)(1).  The safe-harbor provision protects individuals and corporations from liability for a forward-looking statement that proves false or misleading if it is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. *Id*. § 78u–5(c)(1)(A)(i)–(ii).  If the forward-looking statement is not accompanied by cautionary language, a plaintiff must demonstrate that the defendant made the statement with "actual knowledge" of its falsity.  *Id*. at § 78u–5(c)(1)(B).

The Fifth Circuit has described the safe-harbor analysis as requiring "two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind." *Southland Sec. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 371 (5th Cir. 2004).  Under the first prong, the safe harbor protects a forward-looking statement if it is either (1) identified as forward looking and accompanied by "meaningful cautionary statements" or (2) immaterial.  *Id*. Under the second prong, the safe harbor protects a forward-looking statement if the plaintiff fails to prove a defendant's "actual knowledge" that it was false or misleading when made.  *Id*.  The safe-harbor analysis is disjunctive.  Even if the plaintiffs show actual knowledge, the safe harbor may still apply if the statement is either immaterial or is identified as forward looking and is accompanied by

meaningful cautionary language.  *Id.*; *see also Carlton v. Cannon*, 184 F.Supp.3d 428, 452–56 (S.D. Tex. 2016); *In re BP p.l.c. Sec. Litig.*, 843 F.Supp.2d 712, 777 (S.D. Tex. 2012) (*BP I*).

### 2.  Scienter

Section 10(b) and Rule 10b–5 do not protect investors against negligence or corporate mismanagement.  *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 539 (5th Cir. 2008).  Under the PSLRA, for "each act or omission alleged," the plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).  Scienter consists of "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Phillips*, 401 F.3d at 643 (internal quotation marks omitted).  Severe recklessness is "limited to those

highly unreasonable omissions and misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003) (internal quotation marks omitted).

In *Tellabs*, the Supreme Court described how to analyze the sufficiency of scienter allegations under the PSLRA on a motion to dismiss.  551 U.S. at 322–23.  The district court must first determine the factually sufficient complaint allegations and take them as true.  *Id.* at 322.  The court then considers documents incorporated in the complaint by reference and matters subject to judicial notice.  *Id.* at 322–23.  Finally, the court must take into account plausible inferences

14

opposing as well as supporting a scienter inference. *Id.* at 323.  The factual allegations are evaluated collectively, not in isolation, to determine whether the pleadings support a strong scienter inference. *Cf. Barrie v. Intervoice–Brite, Inc.*, 397 F.3d 249, 260 (5th Cir. 2005) ("While [the Fifth Circuit] will view a complaint *in toto* when considering whether a complaint has adequately pled scienter, each allegation of fraud must individually meet the particularity requirements of the PSLRA." (internal citation omitted)).

To be sufficient, the inference need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (internal quotation marks omitted).  But it "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.*  "The strength of an inference cannot be decided in a vacuum." *Id.* at 323.  "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Id.* at 326 (quoting 15 U.S.C. § 78u–4(b)(2)).  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

The Fifth Circuit has rejected "group pleading."  A complaint is insufficient if it alleges that "defendants" as a group knowingly or recklessly made material misrepresentations. *Shaw Group*, 537 F.3d at 533.  A court must look to the mental state of the individual corporate official making or issuing a statement, "rather than generally to the collective knowledge of all the corporation's

officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 365–66 ("[W]e do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded.").

The Fifth Circuit has recently reaffirmed the importance of pleading a strong inference of scienter. In *Local 371 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951 (5th Cir. 2016), the court affirmed the dismissal of a § 10(b) putative class action. The court stressed that "allegations of motive and opportunity standing alone will not suffice, though such circumstantial evidence can enhance the strength of the inference of scienter." *Id*. at 957 (quotation marks omitted). Without more, "an officer's position with a company does not suffice to create an inference of scienter." *Id*. at 958 (quotation marks omitted). An officer's position within a company can support the scienter inference only when viewed with other, "special circumstances." *Id*. at 959. These special circumstances include (1) a small company in which corporate executives are likely to be familiar with day-to-day operations, (2) transactions "critical to the company's continued vitality," (3) omitted information readily apparent to the speaker, and (4) internally inconsistent statements. *Id*.

Corporate statements that allegedly misrepresent facts or omit facts necessary to avoid misrepresentation can be connected to a particular officer if the plaintiff alleges that the officer signed the document in which the statement appears or adequately alleges the officer's involvement in creating the document. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006). Signed SOX certifications support scienter only "if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities

16

or other 'red flags,' that the financial statements contained material misstatements or omissions." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555  (5th Cir. 2007) (internal quotation marks omitted).  A defendant's signature on a SOX certification, without more, does not support a strong scienter inference.  *Dawes v. Imperial Sugar Co.*, 975 F.Supp.2d 666, 693 (S.D. Tex. 2013); *see also Horizon Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 765–66 (8th Cir. 2009); *Zucco Parnters, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009).

"Confidential source statements are a permissible basis on which to make an inference of scienter."  *Central Laborers*, 497 F.3d at 552.  The PSLRA does not require a plaintiff to name confidential witnesses if they are "identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements." *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002)*.*  In lieu of names, however, a complaint must give details such as (1) the person's job description, (2) individual responsibilities, (3) specific employment dates, and (4) where and when the confidential source came to know the information supporting an inference of scienter, such as when a relevant comment was made to the confidential source.  *See Central Laborers*, 497 F.3d at 552; *Shaw Group*, 537 F.3d at 538; *Southland*, 365 F.3d at 382.  Even when a complaint sets out this type of information, the Fifth Circuit has applied *Tellabs* to require district courts to "discount allegations from confidential sources" because these "sources afford no basis for drawing plausible competing inferences."  *Shaw Group*, 537 F.3d at 535; *see also Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences.  Perhaps these

confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist.").
Allegations from anonymous sources are given relatively less weight.  *Carlton*, 184 F.Supp.3d at
460.

### 3.      Loss Causation

Under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission
of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C.
§ 78u-4(b)(4).  The PSLRA "makes clear Congress' intent to permit private securities fraud actions
for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements
of causation and loss."  *Dura*, 544 U.S. at 346.  "To establish proximate causation, the plaintiff must
allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into
the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the
plaintiff's economic harm."  *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th
Cir. 2014).

"Loss causation in fraud-on-the-market cases can be demonstrated circumstantially by
(1) identifying a 'corrective disclosure' (a release of information that reveals to the market the
pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that
the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible
explanations for this price drop, so that the factfinder can infer that it is more probable than not that
it was the corrective disclosure—as opposed to other possible depressive factors—that caused at
least a 'substantial' amount of price drop."  *Id.* at 320–21 (internal quotation marks and citation
omitted).

Although the corrective-disclosure information need not "precisely mirror" the alleged

misrepresentations, *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (quotation marks omitted), a corrective disclosure must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements." *Amedisys*, 769 F.3d at 321.  "The test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Id.*

### C.      Section 20(a) of the Exchange Act

Under § 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any corporation that is found "liable under any provision of this chapter . . . shall also be liable jointly and severally with" the corporation.  15 U.S.C. § 78t(a).  Section 20(a) is a secondary liability provision.  A plaintiff must establish a primary violation under § 10(b) before liability arises under § 20(a). *Tchuruk*, 291 F.3d at 348 n.57.  A plaintiff's failure to state a claim for a primary securities fraud violation under § 10(b) or Rule 10b–5 causes a claim for control-person liability under § 20(a) to fail as well.  *Blackwell*, 440 F.3d at 288.

## III.    The Section 10(b) and Rule 10b–5 Complaint Allegations

### A.      Do the allegations sufficiently plead a material misrepresentation?

The defendants argue that the plaintiffs have not pleaded false or misleading statements because each alleged misrepresentation was (1) immaterial, (2) nonspecific, or (3) a forward-looking statement protected by the PSLRA's safe harbor.  (Docket Entry No. 28 at 9–18).  In response, the plaintiffs rely on their confidential witness's allegations to argue that the alleged misrepresentations were materially false or misleading when made.  (Docket Entry No. 30 at 6–7, 11, 13 (citing Docket Entry No. 23 ¶¶ 33, 37)).

The confidential witness was a general manager of Helix's subsea intervention division from July 2013 to June 2015.  He supervised the installation of various mechanical parts on vessels assigned to the Gulf of Mexico, including the *Q4000*.[4]   (Docket Entry No. 23 ¶ 33 n.4).  The complaint quotes the confidential witness as stating that during his employment, Helix "had some issues with the [*Q4000*'s] Rolls Royce thrusters they were trying to resolve and had been trying to resolve from a previous dry dock."  (*Id*. ¶ 33).  The complaint also alleges that "throughout his employment," the confidential witness read weekly reports that "discussed the *Q4000*'s thruster problems."  (*Id*. ¶ 37).  Neither statement is sufficient by itself or taken with the other to allege the material falsity of the Helix officers' statements.

Each of the challenged statements from Helix's SEC filings or related earnings calls was a forward-looking statement of opinion forecasting a high utilization rate for the *Q4000* until its planned dry dock in April 2015.  The October 2014 Form 8-K stated that the *Q4000* had an 89% utilization rate after ten days of thruster repairs in the third quarter and that Helix expected "strong utilization in Q4 of 2014."  (*Id*. ¶ 40).  The complaint does not allege sufficient facts to show that these statements were false, either when made or afterwards.  The *Q4000* did in fact post high utilization rates—86% and 91%—in subsequent quarters, and Helix reported downtime for the vessel to repair the intervention riser system and to address issues related to a collision with another vessel.  Neither period of downtime related to the vessel's thrusters.  (Docket Entry No. 28, Ex. 3

---

[4] "A complaint relying in part on confidential witnesses must identify the witnesses' job descriptions, individual responsibilities, specific employment dates, experience, and how they knew the information alleged."  *Carlton*, 184 F.Supp.3d at 474 (citing *Central Laborers*, 497 F.3d at 552; *Shaw Group*, 537 F.3d at 538; *Southland*, 365 F.3d at 382; *Dawes*, 975 F.Supp.2d at 692).  Although a court must discount confidential-witness allegations in its scienter analysis under the PSLRA, *see* Part III.B.4. *infra*, in the materiality analysis "Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading" and does not require evidentiary detail of "diagrams or mathematical models" to demonstrate a confidential witness's knowledge.  *Id*. (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185–86 (5th Cir. 2009).

at 80, 93).  Taking the complaint allegations as true, the challenged statements forecasting a high utilization rate for the *Q4000* were not false or misleading when made.  *See  In re BP p.l.c. Sec. Litig.*, 852 F.Supp.2d 767, 810 (S.D. Tex. 2012) (*BP II*) ("[T]he facts Plaintiffs allege are not tailored to the very detailed assertions contained in the [company's] statements.").

The complaint alleges that the 45-day dry dock estimate was false when made.  (Docket Entry No. 23 ¶ 58).  But according to the transcript of the October 2015 earnings call on which the plaintiffs rely, Mr. Kratz stated that "plus or minus 45 days" was "just an estimate because you never know once you get into dry dock."  (Docket Entry No. 28, Ex. 3 at 52, 54).  The third-quarter Form 10-Q released on the same date noted that "[a] dry dock and related recertification process typically lasts one to two months, a period during which the vessel is idle and generally not available to earn revenue."  (*Id.*, Ex. 2 at 36; Docket Entry No. 23 ¶¶ 47–48).  Considered in context, Mr. Kratz's statements provided a meaningful range for the *Q4000*'s dry dock period between 45 and 60 days. *See Rubenstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994) ("[M]ateriality is not judged in the abstract, but in light of the surrounding circumstances." (internal quotation marks and footnote omitted)); *Carlton*, 184 F.Supp.3d at 491 ("*Lormand* undermines the argument [that a statement was not meaningfully cautionary] by requiring courts to examine the context and content of disclosures to determine whether they are meaningful.") (citing *Lormand v. US Unwired*, 565 F.3d 228, 245 (5th Cir. 2009)).  The later actual dry dock period of 64 days does not make the estimated future period a materially false statement.

Even if the length of the *Q4000*'s dry dock made the utilization-rate estimates false, they were made in forward-looking statements protected by the PSLRA's safe harbor.  "If a forward-looking statement is identified as forward-looking and accompanied by meaningful cautionary

statements, the statement is not actionable and the defendants' state of mind is irrelevant." *BP I*, 843 F.Supp. at 777 (citation omitted).  Besides using such inherently forward-looking language as "estimates" and "you never know once you get into dry dock," each challenged statement during the earnings call contained cautionary language about forward-looking statements and incorporated the specific warnings from Helix's Form 10-Ks.  (*See, e.g.*, Docket Entry No. 28, Ex. 3 at 19, 76).  Both Helix's 2013 and 2014 Form 10-K warned that dry docks typically last between one and two months, and that "upgrade, refurbishment and repair" periods were "subject to risks of delay" due to a variety of circumstances.  (Docket Entry No. 23 ¶¶ 48, 54).

The plaintiffs argue that these warnings amount to meaningless "boilerplate" or warnings of "future risks that already existed in fact."  (Docket Entry No. 30 at 8–9).  But the statements specifically warned of precisely the type of delay the plaintiffs focus on—more time in a dry dock than anticipated for regulatory inspections and refurbishment.  The warnings about both the length and causes of dry dock delays are "'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors."  *Southland*, 365 F.3d at 372.[5]  By contrast, the plaintiffs' confidential-witness allegations are not specific enough to support the argument that the defendants' forward-looking statements warned of risks that were described as future but already existed.  The

---

[5]  The plaintiffs' reliance on *Plotkin*, 407 F.3d at 690, does not help their argument.  In *Plotkin*, the defendant company issued a series of press releases forecasting "an annual commitment of $25 million of net purchases"—more than thirty times its prior year revenue—without disclosing that one of its strategic agreement partners was a small company headed for bankruptcy.  *Id*. at 693, 698.  The projection generically warned only that "[t]here can be no assurance as to the amount or timing of revenue from the new technology."  *Id*. at 693.  The Fifth Circuit found that the nonspecific warning did not qualify for the safe-harbor defense.  *Id*. at 702.  But here, Helix's warning were not generic statements that revenue could not be guaranteed—a true statement across all industries and fact-patterns—but specifically related to downtime due to dry dock delays, including planned and unplanned downtime, regulatory and unscheduled dry docking, delays in the repair and refurbishment of vessels, delays in oversight by the Coast Guard and other regulatory agencies, and the risk that each of these could materially affect utilization and Helix's financial bottom line.

allegation that the *Q4000*'s thrusters had "some issues" reported "throughout" the confidential witness's employment falls short of the PSLRA's particularity requirement.  Even taking the allegation as true, it is unclear whether the thruster "issues" were or were likely to be severe enough to require repair or other delays that could reasonably be expected to affect the *Q4000*'s utilization rate.  Helix had disclosed that an earlier thruster repair had required 10 days of downtime.  The confidential-witness allegations do not support a plausible inference that when the defendants made the challenged risk disclosures, they knew or recklessly disregarded that a 45-day dry dock would be insufficient to address the thruster "issues."

The plaintiffs finally argue that once Helix "chose to speak about [the *Q4000*'s thrusters], it had a duty to speak accurately." *BP II*, 852 F.Supp.2d at 797–98 (citation omitted).  The plaintiffs argue that because the defendants discussed thruster repairs during the October 2015 earnings call, they assumed a duty to disclose ongoing problems with the thrusters and thus committed fraud when they omitted mentioning the thrusters in subsequent SEC filings and related earnings calls.  (Docket Entry No. 30 at 5–6).

A "claim of incomplete disclosure is actionable only if what [was] said is misleading.  In other words, it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Shaw Group*, 537 F.3d at 541 (internal quotation marks and citation omitted).  As explained above, Helix's statements about the *Q4000*'s expected utilization rate and thruster repairs did not describe or imply a state of affairs that differed in a material way from the facts.  The *Q4000* did have high utilization rates, and its extended time in dry dock did not materially exceed the forecasts in Helix's forward-looking statements and warnings.[6]

---

[6]  The plaintiffs attempt to assert Helix's liability for failing to disclose "known trends, demands, commitments, events, and uncertainties that are reasonably likely to have a materially adverse effect on a

Taking the complaint allegations, including the confidential-witness allegations, as true, the complaint does not allege sufficient facts to support a plausible inference that Helix officers materially misrepresented or omitted material information regarding the *Q4000*'s expected utilization rates due to thruster issues.

### B.    Do the allegations support a strong inference of scienter?

The defendants argue that even if the complaint did allege sufficient facts to support the inference that the *Q4000* had ongoing thruster issues, the complaint nevertheless fails to allege sufficient facts supporting a strong inference of scienter as to each individual defendant.  (Docket Entry No. 28 at 18–19).  "[A]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter, but . . . allegations of motive and opportunity, without more, will *not* fulfill the pleading requirements of the PSLRA."  *Owens v. Jastrow*, 789 F.3d 529, 539 (5th Cir. 2015) (quoting *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003) (omission original)).  In this case, however, the plaintiffs have not alleged even a possible, much less plausible, motive.  The complaint alleges that Helix officers knew well in advance of the scheduled dry dock that it would last longer than expected due to thruster repairs.  (*See, e.g.*, Docket Entry No. 23 ¶ 55). The complaint does not explain what Helix officers stood to gain by omitting the time needed for repairs from their forecasts and warnings.  That added time would shortly become evident.  These deficiencies in the complaint's scienter allegations are in addition to the problems

---

company's liquidity," thus "violating Item 303 of Regulation S–K."  (Docket Entry No. 23 ¶ 49).  The Fifth Circuit has not held that Item 303 creates a duty to disclose under the Securities Act, and other circuits are divided on the question.  *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (Item 303 creates an actionable duty to disclose); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) (Item 303 does not create a duty to disclose under the Securities Act).  This court need not reach the question, because even if Item 303 could establish liability under the law of the Fifth Circuit, the complaint does not allege that the *Q4000* had thruster issues that were a "known trend" potentially affecting the company's financial condition.

presented by the plaintiffs' reliance on group pleading, officer positions, SOX certifications, confidential witnesses, and stock sales; problems that are explained further below.

### 1.   Group pleading cannot support scienter.

The plaintiffs' complaint relies in part on group pleading to allege scienter.  The plaintiffs allege, for instance, that the "Defendants failed to disclose the problem with the thruster system" and that "the Company scheduled the *Q4000* for dry dock in 2015, in part, to resolve the recurring problems with the vessel's thrusters."  (Docket Entry No. 23 ¶¶ 35, 37).  Group pleading cannot support an inference of scienter.  *Southland*, 365 F.3d at 365; *Blackwell*, 40 F.3d at 285 ("Unlike the Tenth Circuit, our circuit does not permit [group] pleading.").  Individual, not group, pleading is required.  "A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter."  *Southland*, 365 F.3d at 366.  The court must analyze the allegations as to each defendant to determine whether the complaint sufficiently pleads scienter as to that defendant.  *Id.*; *see also Shaw Group*, 537 F.3d at 532–33 ("Consequently, it is only necessary for us to address the allegations claimed to adequately show scienter on the part of the named officers to determine whether the complaint sufficiently pleads scienter." (internal quotation marks omitted)).  "The rejection of group pleading requires plaintiffs pleading fraud claims against individuals under § 10(b) and Rule 10b–5 to distinguish among the defendants and allege each one's role, intent, and knowledge."  *Dawes*, 975 F.Supp.2d at 690 (citing *Southland*, 365 F.3d at 365).

### 2.   Positions in the company cannot support an inference of scienter.

The plaintiffs have alleged knowing or reckless misrepresentations or omissions based on Helix's 2014 Form 10-K; the first-quarter 2015 Form 10-Q, and the Form 8-Ks filed in October

2014, February 2015, and April 2015.  (Docket Entry No. 23 ¶¶ 36–58).  The plaintiffs allege that the misrepresentations or omissions are attributable to the individual defendants who signed the SOX certifications accompanying each form.  (*Id*. nn. 6–9).  The argument is that a strong scienter inference is established as to all the defendants "by their direct and supervisory involvement in the day-to-day operations of Helix," because "[b]y virtue of their high-level position, agency, and their ownership or contractual rights," the individual officer defendants had knowledge of and control over the details of Helix's operations.  (*Id*. ¶¶ 106–107).

"[P]leadings of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company."  *Shaw Group*, 537 F.3d at 535 (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002)).  The Fifth Circuit recognizes a limited exception for small companies in which an officer's position, combined with "a number of special circumstances," can support an inference of scienter.  *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001). "The 'special circumstances' cases exhibit some combination of four considerations that might tip the scales in favor of an inference of scienter," *Diodes*, 810 F.3d at 959, including: (1) a small company where it is more likely corporate executives are familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality"; (3) omitted information readily apparent to the speaker; and (4) statements by the corporate officer that are internally inconsistent.  *Id.*  The alleged misrepresentations in *Nathenson*, for example, involved a small company that sold only a single patented product.  *Nathenson*, 267 F.3d at 425.

None of these considerations support the plaintiffs' arguments here.  The filings cited in the complaint show that Helix is several times larger than companies to which the *Nathenson* exception

has been applied.  Helix has approximately 1,400 employees.  Helix Energy Solutions Grp., Annual Report (Form 10-K) (February 29, 2016) at 13.  *Cf. Nathenson*, 267 F.3d at 425 (32 to 35 employees); *Dorsey v. Portfolio Equities, Inc*., 540 F.3d 333, 342 (5th Cir. 2008) (no employees); *see also Schott v. Nobilis*, — F.Supp.3d. —, 2016 WL 5539756 (S.D. Tex. 2016) (630 employees avoids the *Nathenson* exception); *Carlton*, 184 F.Supp.3d at 479 (183 employees avoids the *Nathenson* exception); *Stephens v. Uranium Energy Corp.*, Civil No. 15-1862, 2016 WL 3855860 (S.D. Tex. July 15, 2016) (61 employees avoids the *Nathenson* exception).

The plaintiffs argue that the *Q4000* "was Helix's most important asset" and that "its utilization rate was of tremendous importance to the Company's financial fortunes." (Docket Entry No. 30 at 16).  But the *Q4000* is one ship in a fleet of five, and well intervention services is one division of Helix's four-fold business model.  Helix's 2014 Form 10-K reports that "[o]ur 'life of field' services are segregated into four disciplines: well intervention, robotics, production facilities and subsea construction."  The *Q4000* is discussed under the well intervention heading.  (*See* Docket Entry No. 28, Ex. 2 at 6, 10).  Although an important asset, the *Q4000*, on the facts alleged, is not plausibly "the lifeblood of the company."  *See In re Netsolve, Inc. Sec. Litig.*, 185 F.Supp.2d 684, 697 (W.D. Tex. 2001).

The complaint alleges no inconsistent statements by Helix's officers.  Indeed, the complaint allegations insist that Helix officers consistently did not mention the *Q4000*'s thrusters at all. (Docket Entry No. 23 ¶¶ 44, 46, 51, 53).  And, for the reasons explained above, the complaint does not allege sufficient facts to support an inference that the *Q4000*'s thrusters posed a problem that would be readily apparent to Helix officers when the challenged statements were made.  The

complaint allegations do not bring this action within the *Nathenson* exception.[7]

### 3.    Misstated SEC filings, on their own, cannot establish scienter.

A defendant's signature on a SOX certification cannot by itself support a strong inference of scienter. *Cent. Laborers*, 497 F.3d at 555 ("If we were to accept this proffered interpretation of Sarbanes–Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA.") (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)).   In *Central Laborers*, the Fifth Circuit adopted the Eleventh Circuit's test for when SOX certifications could support an inference of scienter.   The "person signing the certification [must have] had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements and omissions."   *Id.*

The plaintiffs have not alleged glaring irregularities or red flags that would support an inference of scienter as to the Helix officers who signed SOX certifications or participated in earnings calls.   *Cf. In re ArthroCare Corp. Sec. Litig.*, 726 F.Supp.2d 696, 724 (W.D. Tex. 2010)

---

[7] *See also Rosenzweig,* 332 F.3d at 867–868 (rejecting the plaintiffs' argument that "the failure of Azurix's core business—water privatization projects—supports the inference that defendants knew, or recklessly disregarded, Azurix's prospects for success" and holding that the plaintiffs must "identify exactly who supplied the information or when they knew the information."); *Abrams*, 292 F.3d at 432 ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."); *Collmer v. U.S. Liquids, Inc.*, 268 F.Supp.2d 718, 754 (S.D. Tex. 2003) ("Plaintiffs have relied on the judicially created presumption that facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers. . . . [T]he purpose of the PSLRA's particularized pleading requirements leads this Court to find that such an imputation, without some additional facts such as exposure to content-identified internal corporate documents (and who drafted them, who received them or how plaintiffs learned of them) or specific conversations or attendance at specified management or board meetings dealing with such problems, is inadequate to plead scienter." (quotation marks and citations omitted)); *see also Elam v. Neidorff*, 544 F.3d 921, 929 (8th Cir. 2008) (interpreting *Rosenzweig* as rejecting the "core operations method of pleading scienter").

(SOX certifications supported scienter when accompanied by media reports of the fraud at issue and the defendants' denial of those reports); *In re Seitel, Inc. Sec. Litig.*, 447 F.Supp.2d 693 (S.D. Tex. 2006) (SOX certifications supported scienter when accompanied by internal meeting minutes showing the defendants explicitly discussed the fraud at issue and dismissed the auditor who brought it to their attention). Given the insufficient allegations that Helix officers knew about problems with the *Q4000*'s thrusters, the fact that they signed the SEC filings does not support a strong inference of scienter.

### 4. The confidential-witness allegations do not support an inference of scienter.

"Following *Tellabs*, courts must discount allegations from confidential sources. Such sources afford no basis for drawing the plausible competing inferences required by *Tellabs*." *Shaw Group*, 537 F.3d at 535 (citing *Higginbotham*, 495 F.3d at 756–57 ("*Tellabs* requires judges to weigh the strength of plaintiffs' favored inference in comparison to other possible inferences; anonymity frustrates that process.")). Even if the confidential-witness allegations were not discounted here, those allegations do not support an inference of scienter, much less a strong inference.

The first confidential witness is described in the complaint as a former Helix electronics technical officer. The complaint alleges that he stated that the *Q4000*'s operations were significant to Helix's "financial bottom line." (Docket Entry 23 ¶ 28). The proposition is uncontroversial, but it is unrelated to any defendant's state of mind about the *Q4000*'s thrusters. The second confidential witness, described as a former general manager of Helix's Gulf subsea intervention division, allegedly stated that Helix personnel "had some issues with the Rolls Royce thrusters they were trying to resolve and had been trying to resolve from a previous dry dock" and that Helix personnel

discussed thruster problems in weekly reports that the confidential witness read.  (*Id.* ¶¶ 33, 35).

The witness does not state that he reported to the defendant Helix officers, that they received the

written reports, or that they knew the content of the reports.  The allegations do not specify whether

the weekly reports were produced during the class period, nor whether the "issues" with the thrusters

were significant enough to make extraordinary delays of the upcoming dry dock likely.  Taking all

the confidential-witness allegations as true makes it no more plausible that Helix officers knew

about or recklessly disregarded the *Q4000*'s thruster issues.  The confidential-witness allegations—

properly discounted under the law of this circuit—do not support a strong inference of scienter as

to any officer defendant.

### 5.    The alleged sales of stock do not support an inference of scienter.

The plaintiffs allege that certain stock sales by Helix officers evidences their scienter because

"[t]he timing of these transactions was suspicious."  (Docket Entry No. 23 ¶ 66).  Mr. Chamblee sold

15,000 shares of common stock on October 29, 2014, approximately 20% of his holdings at the time.

(*Id.* ¶ 65).  Mr. Tripodo sold around 18,000 shares in November 2014 and 4,500 more on May 21,

2015.  (*Id.* ¶ 66).

The defendants note that during the class period, Mr. Kratz purchased 71,500 shares of Helix

stock, and that Helix itself purchased 8.4 million shares in 2014 and 1.056 million shares in the first

two quarters of 2015.  (Docket Entry No. 28 at 20).[8]  Courts typically find that "[t]he fact that the

other defendants did not sell their shares during the relevant class period undermines plaintiffs'

claim" of scienter.  *Nathenson*, 267 F.3d at 421 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47,

54 (2d. Cir. 1995)); *see also In re Baker Hughes Sec. Litig.*, 136 F.Supp.2d 630, 646–47 (S.D. Tex.

---

[8]  The court takes notice of Helix's public Form 4 filings to the SEC on March 9, 2015; its Form 10-K
filed on February 18, 2015; and its second-quarter Form 10-Q filed on July 20, 2015.

2001), *aff'd sub nom. Abrams*, 292 F.3d at 424.  And a company's "stock repurchase program rebuts a finding of scienter, since it is illogical that [the company] would have been repurchasing its shares had it been aware of facts that would indicate the price would fall."  *In re Cisco Sys. Inc. Sec. Litig.*, Civil No. 11-1568, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013) (citations omitted).  The plaintiffs do not allege specifically why Mr. Chamblee's or Mr. Tripodo's stock sales were suspicious or support an inference of scienter.  The bulk of the sales were more than five months before the *Q4000*'s dry dock was scheduled to begin.  The fact that other officers and the company itself were purchasing large volumes of Helix stock during this period undermines whatever probative value the stock sales by Mr. Chamblee and Mr. Tripodo may have, and indeed, weighs strongly against an inference of scienter.

### 6. The allegations taken together do not support a strong inference of scienter.

Although "[a] district court may best make sense of scienter allegations by first looking to the contribution of each individual allegation to a strong inference of scienter," it must "follow this initial step with a holistic look at all the scienter allegations."  *Owens*, 789 F.3d at 537. The question is whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter."  *Tellabs*, 551 U.S. at 323.  "[T]he court must take into account plausible opposing inferences," including "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id*. at 323–24.  "The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?"  *Id*. at 323.

At most, the complaint allegations support an inference that the officer defendants were negligent in forecasting the length of the time the *Q4000* would be in dry dock.  There is little

support for a plausible—much less strong—inference that the defendants knowingly or with reckless disregard issued statements misrepresenting the *Q4000*'s expected utilization rates in 2015.  There is a strong, plausible, nonculpable inference that the extent of any thruster problems were not present or were not evident to the officers forecasting the *Q4000*'s utilization rates.  The officers' stock positions in the company further support this nonculpable inference.  "[T]he plaintiffs have at most alleged fraud by hindsight.  Courts treat this as insufficient because it is based on 'the fact that something turned out badly must mean [the] defendant[s] knew earlier that it would turn out badly.'" *Carlton*, 184 F.Supp.3d at 469 (quoting *Lormand*, 565 F.3d at 254); *see also Shaw Group*, 537 F.3d at 536; *Abrams*, 292 F.3d at 433.

To survive dismissal under the PSLRA, the scienter inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling." *Tellabs*, 551 U.S. at 325.  The amended complaint, taken as a whole, does not give rise to a cogent and compelling inference that the defendant officers acted knowing or recklessly disregarding the likelihood of misleading investors when they signed the 2014 and 2015 SOX certifications or participated in earnings calls.

**C.      Do the allegations support a plausible inference of loss causation?**

The defendants argue that even if the plaintiffs sufficiently pleaded material misstatements or omissions made with the required scienter, the class-action complaint should be dismissed for failure to plead loss causation.  To establish loss causation under § 10(b), it is not enough for a plaintiff to allege a stock purchase at inflated prices and a stock-price decline after a negative news report.  *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 340–41 (5th Cir. 2010), *vacated on other grounds*, 563 U.S. 804 (2011).  The loss must result from this truth having "ma[de] its way into the marketplace," not as a result of "changed economic circumstances,

32

changed investor expectations, new industry-specific or firm-specific facts, conditions," or other factors independent of the fraud.  *Dura*, 544 U.S. at 342–43.

The Fifth Circuit has held that the Rule 8(a) and 12(b)(6) plausibility pleading standard, not heightened pleading, is sufficient to plead loss causation.  *Lormand*, 565 F.3d at 258.  ("[W]e conclude that Rule 8(a)(2) requires the plaintiff to allege, in respect to loss causation, a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss or, as *Twombly* indicates, the complaint must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation."  (internal citations omitted)).  A court is "not authorized or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences, as [it] must in assessing allegations of scienter under the PSLRA."  *Id.* at 267.

The defendants argue that the complaint fails the plausibility standard because the announcement of the *Q4000*'s dry dock delay was made in conjunction with other announcements of declining financial performance in the company, including a $50 million downward revision in the 2015 earnings forecast and the underutilization of other Helix vessels due to "'the general market malaise' caused by the industry's 'reduced level of cash flow due to the oil price collapse.'" (Docket Entry No. 28 at 25).  But the analysis at this stage is not whether there are other, more likely, causes of the plaintiffs' loss in share value on the date of Helix's announcement, but whether the plaintiffs have alleged sufficient facts to make the dry dock announcement a plausible cause of

the loss.  "Whether the connection between [Helix's alleged] misleading statements and the alleged corrective disclosures may ultimately be found too attenuated at a later stage in litigation is a highly fact intensive inquiry that need not be reached at this point." *Amedisys*, 769 F.3d at 325.  Because the plaintiffs have not sufficiently alleged a knowing and material misrepresentation on the part of the officer defendants, the court need not decide now whether the allegations of the disclosure of the misrepresentation would support plausible loss causation.

The pleading deficiencies require dismissal for failure to allege sufficient facts supporting a plausible inference of materiality and a strong inference of scienter.  When, as here, a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff a chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice, unless it is clear that to do so would be futile. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).  The complaint is dismissed, with leave to amend, no later than March 17, 2017.

## IV.     Control-Person Liability Under Section 20(a) of the Exchange Act

The plaintiffs alleged that the individual officer defendants are liable as "controlling persons" of Helix under § 20(a) of the Exchange Act. (Docket Entry No. 23 ¶¶ 105–10).  Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" for securities fraud.  15 U.S.C. § 78t(a).  "Control person liability is secondary only and cannot exist in the absence of a primary violation." *Southland*, 365 F.3d at 383.  Because the plaintiffs' primary claims under § 10(b) have been dismissed, the § 20(a) claims are dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. This dismissal is also without prejudice and with leave to amend.

34

V.    **Conclusion**

The defendants' motion to dismiss, (Docket Entry No. 28), is granted.  The dismissal is without prejudice and with leave to amend no later than **March 17, 2017**.  The amended pleading must state with particularity the material misrepresentations made by the individual defendants (no "group pleading") and a basis for scienter beyond signatures on SEC filings and unspecific anonymous sources.

SIGNED on February 14, 2017, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge